7 Cal.4th 295 (1994)
867 P.2d 706
27 Cal. Rptr.2d 595
In re STEPHANIE M., a Person Coming Under the Juvenile Court Law.
SAN DIEGO COUNTY DEPARTMENT OF SOCIAL SERVICES, Plaintiff and Respondent,
v.
NORMA M. et al., Defendants and Appellants.
Docket No. S030816.
Supreme Court of California.
February 24, 1994.
*302 COUNSEL
Carmela F. Simoncini, Miriam R. Kennedy and Pierce M. Kavanagh, under appointments by the Supreme Court, for Defendants and Appellants.
Enrique Loaeza Tovar, Consul General of Mexico, and Celia I. Ballesteros as Amici Curiae on behalf of Defendants and Appellants.
Lloyd R. Harmon, Jr., County Counsel, Susan Strom, Chief Deputy County Counsel, and John E. Philips, Deputy County Counsel, for Plaintiff and Respondent.
Janice R. Mazur, under appointment by the Supreme Court, for Minor.
Francis J. Bardsley, Public Defender (San Diego), Ana Espana, Deputy Public Defender, De Witt W. Clinton, County Counsel (Los Angeles), Larry Cory, Assistant County Counsel, Thomas Lyon, Jeanette Malouf, Lee W. Selvig, Jennings, Engstrand & Henrikson, Debra K. Maurer and Dearing D. English as Amici Curiae on behalf of Plaintiff and Respondent and Minor.
OPINION
MOSK, J. 

I. Introduction

The Court of Appeal reversed the order of the juvenile court denying a motion for change of placement of a minor from foster care to her grandmother's care. The Court of Appeal concluded that the lower court's error in ruling on the motion for change of placement also required reversal of its ensuing order terminating parental rights. The minor and the San Diego County Department of Social Services (Department) petitioned for review, arguing that the Court of Appeal erred in substituting its judgment for that of the juvenile court, in failing to accept the proffer on appeal of new evidence regarding the child's best interests and in ordering her immediate transfer to her Mexican guardian without further hearing in the juvenile court. In *303 response, the parents and Mexico, as amici curiae, have questioned the jurisdiction of any court of this state to determine the custody of the minor, who is a Mexican national.
We conclude that the juvenile court properly exercised jurisdiction under the Uniform Child Custody Jurisdiction Act. (Fam. Code, § 3400 et seq.) We also conclude that the juvenile court did not abuse its discretion in denying the motion for change of placement. Accordingly, the judgment of the Court of Appeal must be reversed. Because we reverse, we do not reach the other issues presented by the minor and the Department.

II. Facts

Stephanie M. was born on January 26, 1989, in Guadalajara, Mexico. She lived in her maternal grandmother's home with her mother until she was nine months old. She moved with her mother in October 1989 to Oceanside in San Diego County, to join her father. All three were Mexican citizens who had entered the United States illegally.
On February 15, 1990, the Department filed a petition to establish the jurisdiction of the juvenile court over Stephanie under Welfare and Institutions Code section 300, subdivisions (a) and (b), alleging that the child had suffered nonaccidental injuries and that the parents had failed to provide adequate medical treatment.[1] It was alleged that on February 11, 1990, the parents brought Stephanie to the hospital because she had stopped breathing. The child was diagnosed as suffering from battered child syndrome. In addition to three bone fractures and substantial bruising, she had recently been suffocated.
The parents denied any abuse and explained that Stephanie had suffered an accident in which her arm was broken and that they had sought treatment from a masseuse, according to purported Mexican custom.
At the detention hearing on February 15, 1990, the juvenile court found a prima facie showing had been made that Stephanie was a person described in section 300, subdivisions (a) and (b), and ordered her placed in foster care. The court ordered the Department to evaluate the homes of relatives for possible placement and authorized detention of the minor with those relatives if appropriate.
*304 Stephanie's maternal grandmother[2] told the social worker assigned to the case that she wished to care for the child. On February 27, 1990, the court set the matter for a contested jurisdictional hearing and authorized the Department to place the child with her grandmother after consultation with the child's counsel. The child remained in foster care, however.
The jurisdictional hearing was held on April 10, 1990. Before the court was the Department's report containing psychological evaluations describing the parents' inadequate functioning and denial of abuse. The Department recommended that Stephanie be placed with her grandmother, as the two were attached to each other, the Mexican social service report was positive and the Mexican agency was willing to assume supervision of the case. The Department's counterpart in Guadalajara, the Sistema Para El Desarrollo Integrale de la Familia Jalisco, had evaluated the grandmother's home favorably, finding it large and the family in possession of sufficient income to care for Stephanie. This agency also recommended placing Stephanie with her grandmother.
Also before the court at the jurisdictional hearing were medical reports describing the seriousness of the injuries inflicted on the child, and reports from the receiving hospital that the parents denied inflicting the injuries, which were clearly nonaccidental. The foster parents proffered evidence that their pediatrician thought it likely Stephanie had been undernourished before her arrival in the United States. They also stated that Stephanie was afraid of her father, and indeed, exhibited extreme fear of most men. They expressed concern that to release the child to her grandmother in Mexico would invite contact with the parents that would be dangerous for the child.
The court found the allegations of the petition true and continued Stephanie in foster care, ordering further reports on the grandmother's suitability and on the question of Stephanie's malnutrition.
At the disposition hearing on May 2, 1990, the court received the social worker's report, which noted that two pediatricians agreed that Stephanie had been malnourished in the past. The social worker stated that she had requested a second evaluation of the grandmother's home, as the grandmother herself had been absent when the Mexican social service agency had evaluated it before. The social worker recommended continued foster care. Also before the court was the report of an investigator employed by Stephanie's counsel, declaring that the grandmother had told the investigator that she did not believe the parents had abused Stephanie, and that the girl had *305 breathing problems as an infant. The grandmother told the investigator, however, that if the child were placed with the grandparents, they would put the child's interest above that of the parents, and would not allow the parents to take Stephanie without court approval.
The court declared Stephanie a dependent of the court and continued her placement in foster care pursuant to section 361, subdivision (b), ordered reunification services for the parents and notified the parents that their parental rights could be terminated if they failed to complete reunification within 12 months. The parents did not appeal.
On July 20, 1990, Voices for Children was appointed as special advocate/guardian ad litem for Stephanie.
At the six-month review hearing held on October 31, 1990, pursuant to section 366, the parents had complied with the reunification plan but continued to deny abuse. The social worker recommended against placement with the grandmother because the grandmother did not believe the parents had abused the child and would therefore be unable to protect the child against further abuse by the parents. The foster parents reported that Stephanie was upset by her parents' weekly visits.
The social worker and special advocate recommended continued foster placement but increased visitation with the parents. The special advocate evaluated the grandmother, noting her visits but questioning her ability to protect Stephanie from the parents. She reported that the parents wished to return to Mexico once they regained custody of the child, but did not wish to live with the grandmother. The special advocate noted conflicting evidence regarding Stephanie's malnutrition in Mexico, and the grandmother's insistence that Stephanie's parents could not have abused her. The psychologist working with the parents also noted their continued denial of abuse and recommended continued foster care.
The court ordered continued foster placement and supervised visitation, along with therapy for the parents.
On May 1, 1991, the case was set for a contested 12-month review on July 8, 1991, and that hearing was continued to July 23, 1991.
On June 6, 1991, the juvenile court received a letter from the consul general of Mexico serving in San Diego, noting its duty to protect and aid Mexican nationals and asking the court to consider the grandmother's demonstrated interest in custody of the child, that the Mexican social service *306 agency had concluded in its second evaluation that the grandmother could meet the needs of the child, and that the entire family, including the child, were Mexican citizens. The consul general asked the court to consider placing the child with the grandmother.
Also on June 6, 1991, the foster parents applied for de facto parent standing, emphasizing their close connection with the child since her placement with them on March 22, 1990, and their desire to adopt the child. The court granted them de facto parent status.
At the 12-month review hearing held on July 23, 1990, the grandmother was present with counsel and 2 representatives of the Mexican consulate, who did not object to the jurisdiction of the juvenile court nor request the intervention of the Mexican consulate or government as a party.
At the hearing, the court had before it the report and recommendation of the Department, which observed that the parents continued to deny the abuse and treated the child inappropriately during visits. It also noted that the child displayed fear of the parents and emotional upset after her visits with them. The Department acknowledged a cautiously favorable psychological evaluation of the grandmother and her attachment to Stephanie. The psychologist noted the grandmother's passive personality, but recommended supervised placement with the grandmother, and opined that Stephanie would not be injured by severance of ties with her parents. An updated Mexican social service report continued to recommend placement with the grandmother. The Department recommended that reunification services be terminated and that a hearing pursuant to section 366.26 be held to establish a plan for adoption, guardianship or long-term foster care. The parents and all parties submitted on the basis of this report and recommendation.
The court found that return of Stephanie to her parents would create a substantial risk of harm to her physical or emotional well-being, that there was no substantial probability of her return to her parents by the 18-month review date, and that reasonable services had been provided to the parents.
The parties did not agree as to placement. The parents requested placement with the grandmother or an aunt in Long Beach. The social worker recommended foster care.
The court ordered increased visitation with the grandmother and set the matter for a contested hearing on September 23, 1991, subsequently continued to October 28, 1991, stipulated to be pursuant to section 388, with the issue to be litigated designated as whether the minor should be placed in the current foster home or with a relative.
*307 The grandmother moved for standing as a party. At the hearing on the motion held September 10, 1991, the court granted standing to provide a statement to the court, present evidence and refute allegations against her in any hearing at which she was present.
At the contested hearing pursuant to section 388, the parties stipulated that the entire court file could be considered on the question of a change of placement from foster parents to grandmother. In addition, there was extensive testimony.
The Department's social worker testified that she had been supervising visits between the child and her grandmother since August 1991. She described the child as extremely emotionally fragile and in need of stability. She did not recommend placement with the grandmother because the grandmother was passive and had not acknowledged the parents' responsibility for the abuse. The grandmother testified that she had at first thought that the parents' roommates had injured the child, but that she had acknowledged the parents' responsibility since February 1990. She conceded that she had told the special advocate in April 1991 that she did not think the parents had hurt the child and that the injuries were the result of a fall. She also testified that if the child were placed with her, she would obey all court orders regarding parental visitation, would not allow the mother to reside with her, and would accept the foster parents into her home for visitation. A representative of the Mexican consulate testified that the Mexican social service agency had assured her they would supervise the child's placement with the grandmother, but would not return her to the United States if that placement were ineffective.
A psychologist expert in the field of child abuse testified that Stephanie exhibited signs of an extensive history of emotional trauma and had post-traumatic stress reaction to severe abuse suffered in her first year of life. He found the child fragile, with a great need for stability. He was of the opinion that if her attachment with the foster parents were disturbed she would suffer considerable psychological disruption. He believed that the child's primary bond was to the foster mother, and that to sever this bond would damage the child. He saw no primary or even secondary bond between the child and the grandmother. He acknowledged that if the child stayed in the foster home, she would have to confront cultural identity issues later in her development.
The foster mother testified that the grandmother did not visit or contact the child between March 1990 and March 1991. She testified that the child was reluctant to visit the grandmother and had adverse emotional reactions to the visits, including toileting accidents, biting, fantasy injuries and sleep disturbance.
*308 In addition, the court had before it the report of a psychologist who evaluated the grandmother and found her passive but adequate to care for the child as long as she had clear guidelines. The psychologist questioned the grandmother's ability to prevent the parents from becoming part of her household. The special advocate reported a similar concern with the grandmother's passive nature, and concluded she was not equipped to provide the special psychological support that the child would need, nor to protect the child from further harm from her parents. Another psychologist reported on visits between the grandmother and the child, and concluded that the child exhibited anxiety in being separated from her foster mother, and had no significant relationship with her grandmother.
The court denied the motion for change of placement on the ground that the child's special emotional needs and lack of primary emotional bond with the grandmother made a change not in her best interest.
At the hearing on January 15, 1992, held pursuant to section 366.26, but denominated a continuation of the earlier hearing, the court found that Stephanie was adoptable and that none of the circumstances that would make termination detrimental to the minor existed. Parental rights were terminated.
On March 17, 1992, the court of the State of Jalisco in Mexico asserted jurisdiction over Stephanie and appointed a guardian. On April 9, 1992, the Mexican government delivered to the juvenile court a letter advising the court of the Mexican court's assertion of jurisdiction and requesting the California court to take the letter under consideration.
Both parents appealed. The Court of Appeal concluded that the juvenile court had erred in denying the motion for change of placement and that therefore, the ensuing order terminating parental rights must also be reversed.

III. Jurisdiction

A. International Law

(1a) Mother argues that the juvenile court lacked jurisdiction over the matter under review because the failure of the juvenile court and the Department to give notice to the Mexican consulate of the pendency of this dependency action violated the Multilateral Vienna Convention on Consular Relations and Optional Protocol on Disputes of April 24, 1963. (21 U.S.T. 77, T.I.A.S. No. 6820, hereafter Convention.)
*309 We agree with the Court of Appeal that any failure to give notice according to the Convention did not deprive the juvenile court of jurisdiction. Article 37 of the Convention, upon which mother relies, provides that: "If the relevant information is available to the competent authorities of the receiving State, such authority shall have the duty: [¶] ... [¶] (b) to inform the competent consular post without delay of any case where the appointment of a guardian or trustee appears to be in the interests of a minor ... who is a national of the sending State. The giving of this information shall, however, be without prejudice to the operation of the laws and regulations of the receiving State...." (21 U.S.T. at p. 102.)
As the Court of Appeal pointed out, the quoted language acknowledges the jurisdiction of the receiving state to apply its own laws to foreign nationals within its borders. Further, article 5 of the Convention requires that consular aid to citizens of the sending state, including minors, be conducted "within the limits imposed by the laws and regulations of the receiving State...." (Convention, art. 5, subd. (h), 21 U.S.T. at p. 83.) In case of consular aid in obtaining judicial relief in the receiving state, such aid is expressly "subject to the practices and procedures obtaining in the receiving State ...." (Convention, art. 5, subd. (i), 21 U.S.T. at p. 84.) The Convention thus concedes the jurisdiction of a court of the receiving state to apply its laws to a foreign national, and the Convention expressly provides that the operation of the receiving state's laws is in no way dependent upon the notice prescribed by the Convention. Thus there is no merit to the contention that any delay in notice to the Mexican consulate deprived the California court of jurisdiction.

B. Uniform Child Custody Jurisdiction Act

Mother argues generally that the juvenile court lacked jurisdiction to "make orders which operated to terminate [the minor's] citizenship in a foreign country and all her relationships to her family." We are at a loss to understand the argument; the juvenile court orders, both with respect to placement of the child and with respect to termination of parental rights, did not purport to terminate the minor's citizenship in Mexico. Mother refers us to no treaty or other source of international law precluding the courts of this state from asserting jurisdiction in this dependency proceeding.
To the extent mother is claiming that the juvenile court lacked jurisdiction ab initio, we agree with the Court of Appeal that the juvenile court properly asserted jurisdiction in this matter under the Uniform Child Custody Jurisdiction Act. (Fam. Code, § 3400 et seq.)
*310 (2) This state has adopted the Uniform Child Custody Jurisdiction Act.[3] (Fam. Code, § 3400 et seq., hereafter the act.) This uniform act provides the exclusive method of determining subject matter jurisdiction in custody cases in California. (Adoption of Zachariah K. (1992) 6 Cal. App.4th 1025, 1034 [8 Cal. Rptr.2d 423].) The act applies to juvenile dependency proceedings (Fam. Code, § 3402, subd. (c); In re Fathom K. (1985) 173 Cal. App.3d 773, 777 [219 Cal. Rptr. 294]), and actions to terminate parental rights. (In re Gloria F. (1989) 212 Cal. App.3d 576, 582 [260 Cal. Rptr. 706, 83 A.L.R.4th 729].) The policies of the act apply to international custody disputes. (Fam. Code, § 3424; Miller v. Superior Court (1978) 22 Cal.3d 923, 928 [151 Cal. Rptr. 6, 587 P.2d 723]; Plas v. Superior Court (1984) 155 Cal. App.3d 1008, 1013 [202 Cal. Rptr. 490].)
Family Code section 3403 defines the prerequisites of jurisdiction. It provides a court that is competent to decide child custody matters has jurisdiction to make a child custody determination if this state is the home state of the child, defined as the state in which the child has lived with a parent for the preceding six months, or if this state was the home state within six months of the commencement of the action, and the child is absent from the state because of a custody dispute and one parent continues to live in this state. (Fam. Code, § 3403, subd. (a)(1).)
A court also has jurisdiction if "[i]t is in the best interest of the child that a court of this state assume jurisdiction because (A) the child and the child's parents, or the child and at least one contestant, have a significant connection with this state, and (B) there is available in this state substantial evidence concerning the child's present or future care, protection, training, and personal relationships." (Fam. Code, § 3403, subd. (a)(2).) The Court of Appeal indicated that the juvenile court may have had jurisdiction under this provision, but placed its primary reliance on a provision defining emergency jurisdiction. A court has jurisdiction if the child is in this state and has been abandoned or assertion of jurisdiction is necessary in an emergency because of threatened or actual mistreatment or abuse. (Fam. Code, § 3403, subd. (a)(3).)[4]
(1b) The Court of Appeal properly found that the juvenile court had continuing jurisdiction over the minor pursuant to Family Code section *311 3403, subdivision (a)(3), providing for emergency jurisdiction.[5] Although we need not determine this point for the purpose of this appeal, it appears that the court also had ongoing jurisdiction under Family Code section 3403, subdivision (a)(2). The child and both parents resided in this state and had a significant connection with this state, and there was substantial evidence developed in this state regarding the ability of the parents to be reunified with the child.
(3a) Mexico, acting as amicus curiae, concedes initial jurisdiction, but argues that the juvenile court should have stayed proceedings under the act on the ground of forum non conveniens once the child had been removed from her parents' custody. The Court of Appeal determined that the juvenile court was under no obligation to consider whether it was a proper forum because it had no notice that Mexico had formally asserted jurisdiction until after its own order was final.
Because the courts of this state have received a request from the sovereign nation of Mexico that custody of a minor citizen of Mexico be turned over to a guardian appointed by a court of Mexico, we feel compelled to answer the jurisdictional claims of Mexico, although they have not been squarely raised by a party.[6]
It is undisputed that there was no motion made in this case to quash jurisdiction on the ground of forum non conveniens. However, the act provides that a court may make a determination on its own motion that California is not a convenient forum for resolution of a child custody matter. (Fam. Code, § 3407, subd. (a).) The statutory grounds for deciding whether California is the appropriate forum do not turn on notice from another jurisdiction that a custody proceeding is pending in that jurisdiction. (See Fam. Code, § 3407.) Accordingly, the Court of Appeal erred in assuming that without notice of a pending Mexican proceeding, the juvenile court was under no obligation to consider whether it was the appropriate forum.
*312 Nonetheless, although the juvenile court could have inquired whether the courts of Mexico would assume jurisdiction and provide a more appropriate forum (Fam. Code, § 3407, subd. (d)), we see no abuse of discretion in the court's failure to decline jurisdiction. (See Pieri v. Superior Court (1991) 1 Cal. App.4th 114 [1 Cal. Rptr.2d 742] [applying abuse of discretion standard of review]; In re Marriage of Fox (1986) 180 Cal. App.3d 862 [225 Cal. Rptr. 823] [same]; Plas v. Superior Court, supra, 155 Cal. App.3d 1008 [same].)
The act provides that a court, in determining if it is an inconvenient forum, should consider if it is in the interest of the child that another state assume jurisdiction. (Fam. Code, § 3407, subd. (c).) The act provides that the court "may take into account the following factors, among others: [¶] (1) If another state is or recently was the child's home state. [¶] (2) If another state has a closer connection with the child and the child's family or with the child and one or more of the contestants. [¶] (3) If substantial evidence concerning the child's present or future care, protection, training, and personal relationships is more readily available in another state. [¶] (4) If the parties have agreed on another forum which is no less appropriate. [¶] (5) If the exercise of jurisdiction by a court of this state would contravene any of the purposes stated in Section 3401." (Fam. Code, § 3407, subd. (c).)
From the time that the juvenile court first exercised jurisdiction over the child's custody in this case, every indication was that California was the appropriate forum. California had continuing jurisdiction because of the emergency presented by the abuse of the child, and the impossibility of returning her immediately to her parents. All the evidence with respect to the abuse and the parents' capacity, in light of this abuse, for reunification, was in this state. It also appears that this state, rather than Mexico, was in the better position to adjudicate the best interest of the child with respect to possible reunification with the parents. The parents, though they were Mexican nationals, resided in California. Both parents acceded to the jurisdiction of the court, and participated in the reunification services the court offered them in an effort to enable them to regain custody of the child. Further, the evidence regarding the child's present and future care and protection was not more readily available in the Mexican jurisdiction, again, because the child's parents resided in this country and all the evidence regarding their ability to resume custody of the child was in this country. The only evidence that was more readily available in Mexico, that is, the evidence of the suitability of the child's grandmother to assume custody pending reunification, was of lesser importance than the evidence available in California; namely, the evidence of the parents' suitability for custody, progress towards reunification, and the progress of the child in foster care. We cannot say that the court abused its discretion in failing to decide, on its *313 own motion, and in the absence of any controversy on the point whatsoever, to decline jurisdiction.[7]
(4) We must point out that the policy of the act is not to establish concurrent jurisdiction, but to narrow jurisdiction. (Fam. Code, § 3401; Plas v. Superior Court, supra, 155 Cal. App.3d 1008, 1018.) "The Act contemplates that where there is concurrent jurisdiction, only one state should exercise jurisdiction." (Plas v. Superior Court, supra, 155 Cal. App.3d at p. 1018.) As one commentator has explained, "The basic plan of the Act rests on identifying one court as having primary jurisdiction.... Courts in other states are required to defer to that court's continuing jurisdiction and to assist in implementing its orders." (2 Casad, Jurisdiction in Civil Actions (2d ed. 1991) pp. 9-49 to 9-50.)
(3b) It is inconsistent with this purpose for a reviewing court to reverse a juvenile court placement or custody order on forum non conveniens grounds, when the matter has not been raised by any party below and a competing jurisdiction seeks, after the judgment is final as to the trial court, to intervene for the purpose of relitigating custody. In the absence of a treaty providing otherwise, we will enforce California custody judgments made by a court with jurisdiction under the act despite the assertion of a foreign nation, after the entry of the custody order, of concurrent jurisdiction.
Mexico argues that relitigation is appropriate here because the California court failed to notify it of the pendency of this action. Although it is true that neither the court nor the Department notified the Mexican consulate of the pendency of this action at the outset, the consulate did appear on behalf of the grandmother in the California proceedings before it had been determined that reunification services would be terminated. The consulate had actual notice, then, of the proceedings, and at no time before the entry of the judgment under appeal did it assert any competing jurisdiction or seek to stay the proceedings on forum non conveniens grounds.

IV. Comity

(5a) There remains the question of what response the courts of this state should make to the letter advising the juvenile court of a guardianship decree in the Mexican court and purporting to authorize the named guardian to take immediate custody of the child and return her to Mexico. The Court of Appeal avoided the issue by pointing out that the matter had not been litigated below because the letter was received after the judgment was final *314 as to the juvenile court. However, the court honored the spirit of the letter by ordering that custody of the child be transferred to the guardian named in the Mexican decree within 60 days of the finality of its opinion.
Father argues that we must affirm the decision of the Court of Appeal because we must extend comity to the judicial decree of the sovereign nation of Mexico. He claims that the courts of this state are obliged under this doctrine to enforce the judgment of the Mexican court.
(6) The courts of this state may, but are not required to, execute the judgment of a foreign nation as a matter of comity. The doctrine of comity prescribes that a court of this nation recognize the judgment of a court of a foreign nation when the foreign court had proper jurisdiction and enforcement does not prejudice the rights of United States citizens or violate domestic public policy. (Hilton v. Guyot (1895) 159 U.S. 113, 202-203 [40 L.Ed. 95, 121-122, 16 S.Ct. 139]; Victrix S.S. Co., S.A. v. Salen Dry Cargo A.B. (2d Cir.1987) 825 F.2d 709, 713.) Extension or denial of comity is discretionary and is reviewed on an abuse of discretion standard. (Remington Rand v. Business Systems, Inc. (3d Cir.1987) 830 F.2d 1260, 1266.)
(5b) Thus, the courts of this state are not required to give effect to the Mexican decree. Indeed, we think that it would violate domestic public policy, as stated in the act, to enforce the Mexican court order, and we note that Mexico itself does not argue that the order should be enforced as a matter of comity.
The act provides for the enforcement of international custody orders to the same extent as orders of other states. (Fam. Code, § 3424.) As we shall explain, it is clear that the order of a sister state providing that custody of the minor be transferred to her grandmother would not be enforced in this state if it had been received at the same time the Mexican order was received. It follows that the Mexican order should not be enforced under Family Code section 3424.
The act attempts to regulate competing claims to jurisdiction over child custody matters. It provides that a court of one state shall not exercise jurisdiction if at the time of filing of the action, a proceeding concerning custody of the child was pending in a court of another jurisdiction "exercising jurisdiction substantially in conformity with this part unless the proceeding is stayed" by the other jurisdiction. (Fam. Code, § 3406, subd. (a).)
If after the filing of the action the court of one state is informed that a proceeding concerning the custody of the child was pending in another *315 jurisdiction before the court assumed jurisdiction, the court is required to stay the proceedings pending determination of the more convenient forum. (Fam. Code, § 3406, subd. (c).)
Most significantly, once a decree is entered by a court that has jurisdiction under the act, the decree is not to be modified by the courts of another state unless "it appears ... that the court which rendered the decree does not now have jurisdiction under the jurisdictional prerequisites substantially in accordance with this part or has declined to assume jurisdiction to modify the decree" and the modifying court has jurisdiction. (Fam. Code, § 3414.)
One of the primary purposes of the act is to avoid the disruption to the life of a child involved in relitigation of custody matters. (Kumar v. Superior Court (1982) 32 Cal.3d 689, 695-696 [186 Cal. Rptr. 772, 652 P.2d 1003].) (7) We have interpreted former Civil Code section 5163, now Family Code section 3414, to mean that once a custody order is entered by a court with jurisdiction under the act, that court has continuing exclusive jurisdiction over any modification of the custody decree as long as that state has "significant connection" jurisdiction under the act. (Kumar v. Superior Court, supra, 32 Cal.3d at p. 696.) It follows that when a California court that has jurisdiction is informed after it has entered a custody decree that another court has commenced modification proceedings on the basis of concurrent jurisdiction, the decree of the California court should be enforced, and any competing decree from another state  or nation  should not.
(5c) It is true, as father claims, that the act does not award jurisdiction on the basis of which party gets to court first. "Priority in time is but one factor to be considered, lest the Act be construed as promoting `races to the courtroom.'" (Plas v. Superior Court, supra, 155 Cal. App.3d at p. 1021.) This case does not represent a race to the courtroom, however. The record before us indicates that no Mexican action was filed during the entire time the dependency proceeding was progressing through the California court. Once a decree is entered, the jurisdiction of the decreeing court is exclusive as long as it continues. Under the circumstances, the California courts are justified in exercising exclusive jurisdiction over the child and refusing to enforce the subsequent foreign order.
We note also that a foreign custody order is enforceable under the act only if "reasonable notice and opportunity to be heard were given to all affected persons." (Fam. Code, § 3424; see Miller v. Superior Court, supra, 22 Cal.3d 923, 928.) In this case, it appears that the Mexican order was obtained ex parte, without notice to the minor or the Department. Accordingly, it does *316 not appear that the order is entitled to enforcement under Family Code section 3424.

V. Due Process

(8) Mexico argues that the failure to give early notice of these proceedings to the Mexican consulate violated the due process rights of the parents, the minor and the extended family as represented by the grandmother. We reject the claim. It is clear that the parents and the minor had notice of the proceedings from the time the dependency petition was filed. The parents and the minor were accorded every procedural protection, including notice, an opportunity to be heard, and the appointment of counsel. Without deciding, as Mexico urges, that the grandmother had any due process right to notice, we observe that the grandmother had actual notice and an opportunity to be heard and to appear with counsel.
We are aware of no due process right to notice belonging not to an individual, but to a foreign consulate for the purpose of enlisting its aid, nor has Mexico referred us to any such authority. References to the Indian Child Welfare Act (25 U.S.C. § 1901 et seq.) are unavailing; there the act specifically provides that a state court order terminating parental rights in an Indian child is voidable if proper notice of the action has not been given to the tribe. (25 U.S.C. § 1914.) The rule is not a matter of due process, but of federal statute. No similar provision governs here. In any event, the consulate had actual notice of the proceedings and the grandmother actually enlisted its aid. The argument must be rejected.

VI. Abuse of Discretion

(9a) The Court of Appeal held that the trial court abused its discretion in denying the motion for change of placement brought under section 388. We disagree.
We have outlined the procedures applicable in child dependency matters too recently to require restatement here. (See, e.g., Cynthia D. v. Superior Court (1993) 5 Cal.4th 242, 247-250 [19 Cal. Rptr.2d 698, 851 P.2d 1307].) Suffice it to say that the orders under our review in this case came late in the proceedings, after the court had found jurisdiction (§§ 334, 355), removed the child from her home and placed her in foster care (§ 358), undertaken the six-month and twelve-month review hearings (§ 366), and concluded that it was unlikely the child could be reunified with her parents (§ 366.21). The matter was set for a hearing on selection and implementation of a permanent plan (§ 366.26), that is, for the hearing at which parental rights would *317 ultimately be terminated, when the parents interposed a motion for a change or reconsideration of the earlier placement order. (10) Such a motion may be brought pursuant to section 388 at any time after the minor has been declared a dependent child of the juvenile court. (See In re Marilyn H. (1993) 5 Cal.4th 295, 308-309 [19 Cal. Rptr.2d 544, 851 P.2d 826].)
Section 388 provides in pertinent part that: "Any parent or other person having an interest in a child who is a dependent child of the juvenile court ... may, upon grounds of change of circumstance or new evidence, petition the court in the same action in which the child was found to be a dependent child of the juvenile court for a hearing to change, modify, or set aside any order of court previously made or to terminate the jurisdiction of the court."
(11) In any custody determination, a primary consideration in determining the child's best interests is the goal of assuring stability and continuity. (Burchard v. Garay (1986) 42 Cal.3d 531, 538, and fn. 6 [229 Cal. Rptr. 800, 724 P.2d 486, 62 A.L.R.4th 237].) "When custody continues over a significant period, the child's need for continuity and stability assumes an increasingly important role. That need will often dictate the conclusion that maintenance of the current arrangement would be in the best interests of that child." (Ibid., fn. omitted; see also In re Marriage of McGinniss (1992) 7 Cal. App.4th 473, 478 [9 Cal. Rptr.2d 182].)
(12) At a hearing on a motion for change of placement, the burden of proof is on the moving party to show by a preponderance of the evidence that there is new evidence or that there are changed circumstances that make a change of placement in the best interests of the child. (§ 388; In re Audrey D. (1979) 100 Cal. App.3d 34, 45 [160 Cal. Rptr. 802]; Cal. Rules of Court, rule 1432(f).)
After the termination of reunification services, the parents' interest in the care, custody and companionship of the child are no longer paramount. Rather, at this point "the focus shifts to the needs of the child for permanency and stability" (In re Marilyn H., supra, 5 Cal.4th 295, 309), and in fact, there is a rebuttable presumption that continued foster care is in the best interests of the child. (Id., at p. 302.) A court hearing a motion for change of placement at this stage of the proceedings must recognize this shift of focus in determining the ultimate question before it, that is, the best interests of the child.
(9b) In the case before us, the juvenile court determined that there was not sufficient evidence produced at the hearing to establish that a change of placement was in the best interests of the child. The court acknowledged *318 evidence that the grandmother would provide an appropriate home, and that the Mexican social service agency would provide adequate services to the child. It also noted the grandmother's special place in the child's life according to Mexican custom. It noted that it was discounting as a "non-issue" earlier concerns that the child might have had an eye injury and might have been undernourished while she lived in Mexico. It stated that the parents' denial that they abused the child was not relevant to the grandmother's suitability, and concluded that the grandmother would follow the direction of the Mexican social service agency in protecting the child from the parents.
Nonetheless, the court found that it would not be in the best interests of the child to transfer her custody to the grandmother, based on the following substantial evidence that the child needed continuity and stability.
The court pointed to evidence that although the grandmother was very caring during her visits with the child, the child was anxious in her company and looked to her foster parents as her primary bond. The court noted that the child had no contact with the grandmother for a year, and that the medical evidence was that the child was still very troubled and fragile. The court pointed to the unanimous opinions of the Department, the doctors, and the child's special advocate that the child had a strong, primary bond with her foster mother and no bond with her grandmother. The court concluded: "She has special needs. Her physical trauma has led to her having some actual physically-observable reactions. She maintains, unfortunately, those problems. The people that can best deal with this right now are her foster parents. [¶] I cannot find that it is in this child's best interests to be transferred to grandmother."
(13) This determination was committed to the sound discretion of the juvenile court, and the trial court's ruling should not be disturbed on appeal unless an abuse of discretion is clearly established. (In re Michael B. (1992) 8 Cal. App.4th 1698 [11 Cal. Rptr.2d 290]; In re Corey (1964) 230 Cal. App.2d 813, 832 [41 Cal. Rptr. 379].) As one court has stated, when a court has made a custody determination in a dependency proceeding, "`a reviewing court will not disturb that decision unless the trial court has exceeded the limits of legal discretion by making an arbitrary, capricious, or patently absurd determination [citations].'" (In re Geoffrey G. (1979) 98 Cal. App.3d 412, 421 [159 Cal. Rptr. 460]; see In re Mark V. (1986) 177 Cal. App.3d 754, 759 [225 Cal. Rptr. 460] [accord]; see also Department of Parks & Recreation v. State Personnel Bd. (1991) 233 Cal. App.3d 813, 831 [284 Cal. Rptr. 839].) And we have recently warned: "The appropriate test for abuse of discretion is whether the trial court exceeded the bounds of *319 reason. When two or more inferences can reasonably be deduced from the facts, the reviewing court has no authority to substitute its decision for that of the trial court.'" (Walker v. Superior Court (1991) 53 Cal.3d 257, 272 [279 Cal. Rptr. 576, 807 P.2d 418], quoting Shamblin v. Brattain (1988) 44 Cal.3d 474, 478-479 [243 Cal. Rptr. 902, 749 P.2d 339].)
(9c) In our view, the juvenile court properly evaluated the evidence, and placing special weight on the child's need for stability, as was appropriate at that stage of the proceedings, determined that the parents had not carried their burden of proof. If we focus on the evidence of the possible effects on the child of placement with the grandmother, it is clear that the juvenile court was well within its discretion in deciding that a change of placement was not in the child's best interests. The evidence at the hearing showed that the grandmother had limited contact with the child during her stay in foster care, and that she had not visited, written, or called the child for over a year.[8] Regardless of the cause of these omissions, it was undisputed that the child lacked any significant bond to her grandmother, and indeed, could barely communicate with her due to language differences. There was evidence that the child was unusually emotionally unstable, suffered from post-traumatic stress, had a strong primary bond with the foster parents, and was uneasy with the grandmother when she did visit.
The Court of Appeal was of a different view, holding that the juvenile court abused its discretion in the following respects: (1) by failing to accord sufficient weight to the statutory preference for placement with relatives set out in section 361.3, subdivision (a); (2) by failing to accord sufficient weight to the report of the Mexican social services agency regarding the suitability of placement with the grandmother and by failing to accord sufficient weight to new evidence that should have dispelled earlier concerns about placement with the grandmother; and (3) by elevating a concern with the child's bond to her foster parents over a concern with the interest of the grandmother and extended family in preserving the familial bond. We examine each point, and conclude that the Court of Appeal improperly reweighed the evidence and substituted its judgment for that of the juvenile court. Its decision cannot stand.

A. The Relative Placement Preference

(14) The Court of Appeal held that the juvenile court failed to give sufficient weight to the relative placement preference set out in section 361.3. The minor urges us to hold that the statutory preference for placement *320 with relatives does not apply once the juvenile court has terminated reunification services. (Compare In re Baby Girl D. (1989) 208 Cal. App.3d 1489, 1494 [257 Cal. Rptr. 1] [preference inapplicable at permanency planning stage] with In re Jessica Z. (1990) 225 Cal. App.3d 1089, 1098-1099 [275 Cal. Rptr. 323] [no bright line when preference ceases to apply].) We decline to do so. The question is academic; relevant provisions of the statute have been amended significantly since the hearing under review (see § 361.3, subd. (d); Stats. 1993, ch. 892, § 2.5), and our interpretation of the statute would be obsolete as soon as we uttered it. Furthermore the record does not indicate that the trial court refused to apply the relative placement preference at the hearing, nor did the Court of Appeal reverse the lower court for failing to apply the preference at the hearing on change of placement. Rather, the reviewing court held that the juvenile court gave insufficient weight to the grandmother's claim for placement preference under the statute from the very beginning of the dependency proceedings, up to and including the hearing on change of placement.
Assuming without deciding that the statutory preference applied at the late stage of the proceedings that we review here, the juvenile court did not abuse its discretion in failing to give sufficient weight to the grandmother's request for placement. The statute applicable at the time of the hearing did not operate as an evidentiary presumption in favor of placement with the grandmother that would overcome the juvenile court's duty to determine the best interests of the child. Rather, as we shall explain, the statute expressed a command that relatives be assessed and considered favorably, subject to the juvenile court's consideration of the suitability of the relative's home and the best interests of the child. In the context of a motion pursuant to section 388 for change of placement after the termination of reunification services, the predominant task of the court was to determine the child's best interests, which the court here did.
Section 361.3, subdivision (a), provided at the time of the hearing in this case that "[i]n any case in which a child is removed from the physical custody of his or her parents pursuant to Section 361, preferential consideration shall be given to a request by a relative of the child for placement of the child with the relative." The statute defines "preferential consideration" to mean that "the relative seeking placement shall be the first placement to be considered and investigated." (Former § 361.3, subd. (d)(1), now § 361.3, subd. (c)(1).) By its own terms, then, the statute did not supply an evidentiary presumption that placement with a relative is in the child's best interests.
The provision also directed the court to consider, "[i]n determining whether placement with a relative is appropriate" (italics added), the ability *321 of the relative to provide a secure and stable environment for the child. (§ 361.3, subd. (a).) At the time of the proceedings in this case, the statute provided that among the criteria to be considered in determining the ability of the relative to provide such an environment, the court should consider "the good moral character of the relative; the ability of the relative to exercise proper and effective care and control of the child; the ability of the relative to provide a home and the necessities of life for the child; which relative is most likely to protect the child from his or her parents; which relative is most likely to facilitate visitation with the child's other relatives and to facilitate reunification efforts with the parents; and the best interests of the child." (Former § 361.3, subd. (a).)
The statute acknowledges, then, that the court is not to presume that a child should be placed with a relative, but is to determine whether such a placement is appropriate, taking into account the suitability of the relative's home and the best interest of the child. (See, In re Andrea G. (1990) 221 Cal. App.3d 547, 556 [270 Cal. Rptr. 534] [court did not presume relative placement appropriate, but properly considered the factors set out in § 361.3].)
The Court of Appeal relied on In re Jessica Z., supra, 225 Cal. App.3d 1089, for the proposition that the relative placement preference may be applicable at any stage of the dependency proceeding. However, it failed to analyze the holding of the case, which was that the juvenile court acted within its discretion in denying a request made at the 12-month review hearing for a change of placement from a foster home to a grandparent, on the ground that the change would disrupt the child's bond with the foster parent and thus be detrimental to the child. (Id., at p. 1100.) The case actually stands for the proposition that regardless of the relative placement preference, the fundamental duty of the court is to assure the best interests of the child, whose bond with a foster parent may require that placement with a relative be rejected.
The question before the juvenile court at the hearing on change of placement was, at bottom, to determine whether a change of placement was in the best interests of the child. The grandmother's home had been evaluated. She testified at the hearing. The court carefully considered the question of placing the child in her custody, and essentially found her home to be a suitable one. Nonetheless, it was the considered judgment of the juvenile court that a change of placement was not in the child's best interest, in view of her fragile emotional state and her successful and enduring bond with the foster parents. We see no abuse of discretion or misapplication of the statute in this conclusion.
*322 The Court of Appeal also criticized the lower court for failing to give sufficient weight to the relative placement preference from the very outset of the proceedings. However, at the hearing on the motion for change of placement, the burden was on the moving parties to show that the change was in the best interests of the child at that time. Evidence that at earlier proceedings the court had not sufficiently considered placement with the grandmother was not relevant to establish that at the time of the hearing under review, placement with the grandmother was in the child's best interests.[9]
Accordingly, Court of Appeal erred in concluding that the juvenile court abused its discretion when it failed to give sufficient weight to the relative placement preference of section 361.3.

B. Suitability of Grandmother's Home

The Court of Appeal determined that there was substantial evidence that the grandmother's home would be a suitable placement for the child. It criticized the juvenile court for failing to give sufficient weight to the positive evaluation of grandmother's home prepared by the Mexican social service agency.[10] It also criticized the lower court for continuing to give weight to evidence that suggested some deficiencies in her home. Mother argues that we should hold the Mexican social services report conclusive on the issue of suitability, as a matter of comity.
(15) Our review of the record persuades us that the criticisms levied by the Court of Appeal are misplaced, and that the weight to be given to the foreign social services report is not a question that is at issue here. The juvenile court scrupulously reviewed the evidence presented to it at the change of placement hearing, including the report of the Mexican social services agency, and essentially agreed that the grandmother's home was suitable. Nonetheless it found, based on substantial evidence, that a change of placement was not in the child's best interests. Thus the efforts of the *323 parties to persuade us of the proper level of deference to be accorded a foreign social service report are misguided. The lower court essentially assumed the suitability of the foreign home, but was unpersuaded that the child should be moved.
The Court of Appeal charged the juvenile court with having misinterpreted and disregarded some of the evidence. In a perplexing paragraph, the Court of Appeal declared that the juvenile court incorrectly referred to evidence that the child had been malnourished when she lived in Mexico, but then, in the same paragraph, the Court of Appeal acknowledged that the juvenile court had found this question of malnutrition a "non-issue" in the case. Our review of the record indicates that the latter assertion is correct.
With respect to the suitability of the grandmother as a caretaker, the Court of Appeal also found the juvenile court erred in supposing there was no evidence to explain why the grandmother had not come forward earlier in the proceedings. A review of the record establishes the juvenile court understood the grandmother's testimony was that she should not come forward in the juvenile court proceeding while her daughter was still trying to be reunified with her child. "Now, she may have been under the impression that mother and father were going to get the child back. This is not grandmother's fault. There was little she could do to really encourage that." The juvenile court accurately characterized the evidence.
The Court of Appeal appeared most disturbed with the juvenile court's comment that the grandmother's intervention came "late in the game." The Court of Appeal asserted that the grandmother should not be penalized for the timing of the motion because the court itself had failed to properly consider her as a placement alternative earlier in the proceedings. The Court of Appeal objected that "Grandmother had shown consistent interest in the child from the beginning of the dependency proceedings, and the court had earlier questioned whether the Department's failure to follow up on the DIF investigations should properly be held against Grandmother."
This comment demonstrates the Court of Appeal's view that grandmother's rights had been violated during the dependency proceeding. However, the issue being litigated at the hearing was whether a change of placement to the grandmother's home would be in the best interests of the child. The juvenile court, unlike the Court of Appeal, properly focussed on the child's interests, rather than the grandmother's interest. From the point of view of the child, the grandmother's intervention did come too late; the child was already bonded to foster parents. We do not read the juvenile court's *324 statement as suggesting that it was penalizing the grandmother for any delay. Rather, the court was making the point that it was late in the day to consider changing the placement of the child, in view of the child's fragility and her substantial bond to the foster parents. This point was central to the juvenile court's determination that it was not in the child's best interests to undergo a change of placement, and we see no error.

C. Bonding

The Court of Appeal acknowledged the evidence regarding the child's close bond with her foster mother, and lack of bond with her grandmother, but stated: "While we cannot minimize the importance of Stephanie's bonding to her loving foster parents, we are loathe to place this newly created relationship above the interests of loving grandparents, who have consistently shown an interest in the child, and whose supposed deficits have, upon examination, been found not to be substantial or determinative. While Grandmother did not cite the appropriate litany or incantation that the Department apparently wanted to hear, she did consistently present herself as a willing and loving relative caretaker who had the best interests of this child at heart."
(16) The Court of Appeal erred in giving too great weight to the grandmother's interest in maintaining a family tie with the child and substituting its judgment for that of the juvenile court. Putting aside the question whether the grandmother had any cognizable interest at all, and treating her as a parent, her interests were not significant compared to the need of the child for stability. (In re Marilyn H., supra, 5 Cal.4th at p. 309.)
Not only did the Court of Appeal err in giving too great weight to the interest of the grandmother, at a point when the interest of the child in stability had become paramount, it also erred in introducing considerations of national sovereignty and complaints against the Department into a review of proceedings that had to do only with the best interests of the child. The Court of Appeal stated: "We place some weight upon the competition of nationalities involved here. For what reason did the Department evidently assume that its sister agency, DIF, was incapable of adequately protecting Stephanie, a Mexican national with Mexican parents, in her Mexican grandmother's home? The Department repeatedly expressed concern about the distance involved and the difficulties in supervising a Mexican placement. Why then did it not defer jurisdiction to Mexico? It seems the Department may have had problems in taking into account cultural differences between Mexican families and the conventional wisdom of child welfare services in California."
*325 Again, the Court of Appeal apparently lost sight of the proceeding under review: it was to review the judgment of the juvenile court at the hearing on the motion for change of placement, not to express its opinion about purported national chauvinism in the Department at some earlier stage of the proceedings. The suggestion that the Department should have deferred jurisdiction to Mexico is off the mark, as there was no proceeding in Mexican courts to which the Department could have deferred. And, at the hearing on the motion for change of placement, the trial court did not express any hesitation about the ability of the Mexican social service agency to supervise placement; in fact, the court expressed confidence in the services that would be available to the child in Guadalajara.
The essence of the juvenile court's ruling was that the child was fragile, that she had a strong, healthy bond with the foster mother, and essentially no bond with the grandmother, despite the opportunities that had been available to the grandmother to create such a bond. The juvenile court correctly focussed on these factors in deciding the best interests of the child. The Court of Appeal's institutional concerns were misplaced.
Both parents argue that a child's bond with foster parents cannot be the sole basis for a custody determination, and that, in fact, social scientists no longer unanimously recognize the continuation of a child's primary bond with a "psychological parent" as essential to the child's ultimate psychological well-being.
The juvenile court did not reject the motion for change of placement solely because the child had a satisfactory bond with the foster parents. Rather, the court was careful to explain that the child was quite fragile and had special needs, and that in her particularly delicate condition, a change of placement to a relative whom she barely knew would not be in her best interests. Further, the parents' reliance on authority holding that parental rights may not be terminated solely because the child has bonded to foster parents is misplaced. (See, e.g, In re Rodrigo S. (1990) 225 Cal. App.3d 1179, 1185 [276 Cal. Rptr. 183] [in termination of parental rights under Civil Code, former § 232, finding of detriment cannot depend solely on potential loss of attachment to foster parents]; In re Venita L. (1987) 191 Cal. App.3d 1229, 1240 [236 Cal. Rptr. 859] [same at permanency planning hearing].) Unlike the standard analyzed in those cases, the standard the juvenile court was to apply at the hearing on change of placement did not require that it place the child with the grandmother unless such a placement would be detrimental to the child. Rather, the court was to decide whether the parents had carried a burden of showing that the proposed change of placement was in the best interests of the child.
*326 With respect to the parents' claim that new views have emerged in the field of child psychology questioning the assumption that a child's bond to a "psychological parent" should not be disrupted, we need only respond that the law is not in thrall to passing psychological theory. (See In re Robert J. (1982) 129 Cal. App.3d 894, 905 [181 Cal. Rptr. 188] (opn. of Grodin, J.); see also In re Mark V., supra, 177 Cal. App.3d at pp. 761-762.) The Legislature has declared that a dependent child has an interest in continuity and stability in placement. (§§ 352, subd. (a), 366.25, subd. (a), 366.26, subd. (b), 388; In re Marilyn H., supra, 5 Cal.4th at pp. 307, 308-310; In re Heather P. (1989) 209 Cal. App.3d 886, 892 [257 Cal. Rptr. 545].) This interest was served by the order denying change of placement.

VII. Conclusion

The judgment of the Court of Appeal reversed the order of the juvenile court denying change of placement and, purely because of the effect the Court of Appeal found the change of placement order would have on the order terminating parental rights, the Court of Appeal judgment reversed the latter order as well. We reverse the judgment of the Court of Appeal, and remand the case to that court for further proceedings not inconsistent with this opinion.
Lucas, C.J., Kennard, J., Arabian, J., Baxter, J., George, J., and Panelli, J.,[*] concurred.
Appellants' petition for a rehearing was denied May 12, 1994, and the opinion was modified to read as printed above.
NOTES
[1] Statutory references are to the Welfare and Institutions Code unless otherwise indicated.
[2] In 1991 the grandmother was 38 years old, the grandfather was 39, and they had 2 children aged 5 and 13 living with them.
[3] Every state in the Union has adopted the act. (1 Adams & Sevitch, Cal. Family Law Practice (8th ed. 1993) Interstate Custody, § C.2.)
[4] The final basis of jurisdiction established under the statute does not appear to apply here. It is that no other state would have jurisdiction under rules substantially similar to ours, or another state has declined jurisdiction on the grounds of forum non conveniens and it appears it is in the best interest of the child to adjudicate the matter in this state. (Fam. Code, § 3403, subd. (a)(4).)
[5] After briefing concluded, mother referred us to the recent decision of the Court of Appeal in In re Joseph D. (1993) 19 Cal. App.4th 678 [23 Cal. Rptr.2d 574] for the proposition that a juvenile court asserting emergency jurisdiction cannot enter jurisdictional or dispositional orders without contacting the jurisdiction where the child had been most recently residing. The case is inapposite; there the California juvenile court was aware that a sister state custody order was in effect and nonetheless improperly asserted continuing concurrent jurisdiction to determine the child's custody. Here, by contrast, the juvenile court did not assert jurisdiction in the face of a competing foreign custody order.
[6] We decline to reach the arguments of Mexico that the juvenile court should have applied Mexican law in adjudicating this dependency matter, because this choice of law question was raised neither in the juvenile court nor in the Court of Appeal, and because it is not a jurisdictional question or a question of international treaty. We also do not separately address the arguments of Mexico that the juvenile court abused its discretion, as these arguments are adequately addressed by the parties.
[7] We do urge courts in the future, however, to carefully consider the problem of forum non conveniens in dependency proceedings involving foreign nationals.
[8] There was some evidence that her failure to contact the child arose from a misunderstanding that she could not become involved until the dependency proceedings were over.
[9] We note that in fact, the grandmother's home was evaluated and considered at earlier proceedings. This is not a case in which the relative's home was not evaluated or considered at all. (Cf. In re Rodger H. (1991) 228 Cal. App.3d 1174, 1184-1185 [279 Cal. Rptr. 406].)
[10] Mother argues that the juvenile court was required by the supremacy clause of the United States Constitution to follow the placement recommendation of the Mexican social service agency. She reasons that to allow a state court to reject the placement recommendation of a foreign social service agency would be to permit the state court to conduct foreign affairs, in particular, immigration policy. She claims that the custody of the minor is a "question of international law reserved to the federal government under the supremacy clause of the United States Constitution."

Mother provides no authority in support of the claim. The claim was not raised in the trial court nor in the Court of Appeal and we decline to address it here.
[*] Retired Associate Justice of the Supreme Court sitting under assignment by the Chairperson of the Judicial Council.