Filed 11/12/21  K.A. v. Superior Court CA4/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

|  |  |
|---|---|
| K.A., | |
| Petitioner, | E077667 |
| v. | (Super.Ct.Nos. J279537, J279538 & J289157) |
| THE SUPERIOR COURT OF SAN BERNARDINO COUNTY, | |
| Respondent; | OPINION |
| SAN BERNARDINO COUNTY CHILDREN AND FAMILY SERVICES, | |
| Real Party in Interest. | |

ORIGINAL PROCEEDING; petition for extraordinary writ.  Erin K. Alexander, Judge.  Petition denied.

Denise Adigun for Petitioner.

No appearance for Respondent.

Steven O'Neill, Interim County Counsel, and Svetlana Kauper, Deputy County Counsel, for Real Party in Interest.

1

K.A. (mother) petitions for extraordinary relief pursuant to rule 8.452 of the California Rules of Court seeking to set aside the orders of the San Bernardino County Juvenile Court (i) denying her section 388 petition as to two of her children, (ii) bypassing services as to a third child, and (iii) setting Welfare and Institutions Code[1] section 366.26 permanent plan selection hearings for all the children without limiting the plan to be considered to the option of a legal guardianship. We deny the petition.

## BACKGROUND

The subjects of this appeal are the three children of D.A. and mother: L1 (born in April 2014), L2 (born in March 2017), and L3 (born in September 2020). Mother also has two children from a prior relationship, G.M. and J.M.

*1. The events leading to dependency proceedings involving L1 and L2*

In October 2018, 14-year-old G.M. revealed to her father that two years earlier her stepfather, D.A., had made her touch his penis. Her father reported the incident to the police.

Investigation revealed that D.A. had also sexually molested another child in his family over a period of eight years, including instructing that child to rub his penis until he ejaculated. Mother had heard about D.A.'s "relationship" with that victim but said she was not sure about the details. Even so, when G.M., then 12 or so years old, told mother about D.A. forcing her to touch his penis, mother did not believe her. She instructed G.M. "to forget about it and forgive" D.A. and to lie to any investigating authorities so

---

[1] All statutory references herein are to the Welfare and Institutions Code.

the children would not be removed from home. In response to her mother, G.M. recanted the allegations and did not reveal them to her father until two years later.

G.M.'s disclosure to her father and the subsequent investigation resulted in a referral to real party in interest, San Bernardino County Department of Children and Family Services (the Department). The Department took the children into protective custody and filed juvenile dependency petitions pursuant to section 300. G.M. and J.M. were placed with their father and their dependencies were soon dismissed with family law orders.

While the hearings on jurisdiction and disposition were pending, mother told the Department that although she did not know what to believe, she had moved out of the family home and was no longer living with D.A.

In February 2019, the juvenile court adjudged L1 and L2 dependents of the court, removed them from their parents' custody, and placed them with nonrelative extended family members. The court ordered family reunification services and supervised visits with the children to take place a minimum of once a week for two hours.

*2. Reunification efforts are not successful, the children are placed with their paternal grandparents, and L3 is born*

By the time of the August 2019 report prepared in anticipation of the six-month review hearing, the parents had completed a 12-session parenting class. Mother had participated in general and individual counseling, including instruction concerning types of abuse and neglect, characteristics of abusers, and how to increase her capacity to protect her children. By then, mother was again living with D.A. and both parents

3

expressed their desire to preserve their marriage and reunify with L1 and L2. They consistently attended supervised two-hour visits together with the children twice a week.

At the August 2019 hearing, the court expressed concern about the parents' progress in therapy. After eight sessions over a seven-week period, mother's therapist Ms. Gonzalez reported that the treatment goals (increase in protective capacity, psychoeducation, and insight on different types of abuse) had been met. Even so, the court was concerned about comments made by both parents contrary to the true findings on the abuse-related allegations. It ordered an additional six months of reunification services and referrals to new therapists for the parents.

In January 2020, in advance of the 12-month review hearing then set for February 2020, the Department reported the children enjoyed visits with their parents, but the parents had not addressed in therapy the concerns bringing the family into the dependency system. Mother had completed eight additional sessions of individual counseling with a new therapist who reported mother continued to minimize and not fully acknowledge her daughter's allegations of sexual abuse by D.A. Moreover, mother had continued to live with D.A. The Department recommended termination of family reunification services and the setting of a permanent plan selection hearing pursuant to section 366.26. The review was set for contested hearing on March 27, 2020, but did not go forward until November 5, 2020.

Shortly after the Department prepared its 12-month review report in which it recommended the court order services terminated and set a 366.26 hearing, mother told

the social worker she and D.A. had separated. They began to visit the children separately and in March 2020 mother filed a petition for divorce.

Meanwhile, in March 2020, the children's paternal relatives, who were estranged from D.A., learned of the dependency proceedings and filed relative information forms with the court. In June, the paternal grandparents filed a section 388 petition seeking placement of the children in their home. The court authorized the Department to arrange for L1 and L2 to have unsupervised visits with the grandparents, including overnights and weekends, on condition the father had no contact of any kind with the children.

The Department's September 9, 2020 addendum to its 12-month review report recommended the children's placement with their grandparents. It also reported mother and D.A. were expecting another baby, due to arrive in a month. Mother said her attorney had advised her to tell the Department to contact counsel if it wanted any information about her pregnancy.

In September 2020, L3 was born. When the social worker asked, mother acknowledged his birth but refused to give any other information. The Department later learned that efforts were made to keep L3 outside of San Bernardino County because "CPS doesn't cross county lines."

At the November 5, 2020 contested review hearing, the court found services had been provided beyond the 18-month period with neither parent progressing to unsupervised visits or establishing benefit from therapy. It ordered termination of family reunification services and placed the children with their paternal grandparents, effectively granting the grandparent's section 388 petition. Because the children needed time to get

5

stabilized in their new placement, the court found it was not in their best interests to set a section 366.26 permanent plan selection hearing. For the time being, it ordered a plan of placement with a relative and a future goal of adoption.

A postpermanency review hearing was held on April 30, 2021. The court set a trial date for June 22, which was to include consideration whether a section 366.26 could be set and whether mother's visits could be unsupervised.

*3. Mother files section 388 petitions seeking custody of L1 and L2*

On May 5, 2021, five days after the April review hearing, mother filed petitions pursuant to section 388 asking for custody of L1 and L2 or, in the alternative, for orders permitting her unsupervised visits with overnight and weekend stays, or to increase the frequency and duration of her visits.

In support of her petitions, mother attached a June 2020 report from therapist Gonzalez, the same therapist the court ordered replaced at the six-month review hearing in August 2019. On February 18, 2020, well before reunification services were terminated in November 2020, mother had returned to Gonzalez as a private patient. On May 7, after 20 sessions of psychoeducation and a claimed increase in mother's protective capacity as demonstrated by her separation from D.A., Gonzalez and mother agreed mother had met her treatment goals.

Mother also attached to her petitions a report from Ms. Minnick, a therapist formerly employed by the Los Angeles Department of Children and Family Services. In January 2021, after termination of family reunification services, mother engaged Minnick on a private-pay basis. After a virtual assessment and three virtual sessions, and based on

6

mother's self-reporting of her circumstances, Minnick stated she was baffled and confused as to why mother was not receiving family reunification services. She recommended services be provided immediately.

The petitions were set for hearing.

*4. L3 is taken into protective custody, a juvenile dependency petition is filed on his behalf, and he is ordered detained*

In the course of the April 2021 postpermanency review hearing, mother's counsel advised the court that his client had given birth to a baby, L3, many months earlier. Mother was ordered to provide an updated address. Thereafter, when the worker went to mother's home, L3 was not there, and mother refused to disclose his whereabouts.

After mother refused to disclose where L3 was, a 10-day referral was issued. On May 5, 2021, a level 5 social services practitioner went to the apartment where mother reported she was living. The residence appeared vacant except for a camera placed in the front window. The property manager confirmed that mother, D.A., and L3 were all on the lease, which had just been recertified in October 2020. She told the practitioner the window camera enables mother to watch who comes to the door by using an application on her phone. The manager also reported that mother had not been paying her rent and does not stay at the apartment, although several neighbors told her that mother and D.A. had been seen coming to the place in the evenings and leaving before morning.

On May 11, 2021, the practitioner obtained a warrant to enter several addresses apparently associated with mother and, accompanied by another social services practitioner and a Riverside County Sheriff's deputy, she located L3 at his maternal

7

aunt's home where mother was having a visit with L1 and L2. Also present were other family members, including the paternal grandmother.

The worker took L3 into protective custody and filed a section 300 juvenile dependency petition on his behalf. The court ordered his detention in a confidential foster home.

In its report on jurisdiction and disposition, the Department recommended bypass of family reunification services pursuant to subdivision (b)(10) of section 361.5 because L3's parents had failed to reunify with his siblings and had not subsequently made a reasonable effort to treat the problems that led to the siblings' removal. In June, the court sustained the petition, authorized placement of L3 in the paternal grandparents' home, and set the issue of disposition for a contested hearing.

5. *The interim review report in opposition to mother's section 388 petition*

In its interim review report filed in June 2021, the Department expressed its opposition to mother's efforts to gain custody of L1 and L2, or to have visits changed to unsupervised.

It noted that, although mother documented completion of services and engaged in services, her progress had been minimal. In addition, she had not been willing to meet with the Department and there were issues concerning her credibility surrounding where she was living, her relationship with D.A., and her efforts to hide L3 from the Department. Moreover, L3 was in foster care, and mother followed the foster parent and L3 after a visit. The foster parent drove around for approximately 40 minutes until her call to law enforcement resulted in a police officer pulling mother over. The officer

8

reported mother was uncooperative and lied, saying she was not following the foster parent but was on the way to visit a cousin. Mother later acknowledged to her therapist that it was very inappropriate to follow the foster mother and was worried it would have a negative impact on her case.

6. *The contested hearing of mother's section 388 petitions, L3's disposition, and the plan for L1 and L2*

On August 31, 2021, the court held a contested hearing to address three issues: (i) whether it should grant mother's section 388 petitions requesting L1 and L2 be placed with her or for further reunification services be provided as to them; (ii) whether services should be bypassed for L3; and, (iii) whether a section 366.26 hearing should be set with a goal of adoption with the paternal grandparents.

At the hearing, mother's therapist Minnick testified mother had participated in a total of 12 sessions with her and that she considered mother a fit parent who should have her children returned to her. She believed mother had benefitted from previous treatment (that is, her sessions with therapist Gonzalez) with respect to the abuse allegations. Moreover, she saw no need to focus on whether mother admitted any wrongdoing or accepted responsibility with respect to the sexual abuse of G.M. because her sessions with mother were not court-ordered. Sessions with Minnick were "more about managing the situation," processing what she was going through with the children.

Minnick also testified that she and mother had developed a plan for mother to avoid contact with D.A. (such as not answering the door and calling the police if he came to her home). Minnick believed mother should have the children in her custody or at

9

least be provided reunification services because she appeared to be managing, she had done all that had been required of her, and she was loving, committed, devoted, and protective.

In the course of her testimony, Minnick acknowledged she would be very concerned if there was evidence that mother was still in a relationship with D.A. because it would indicate dishonesty, lack of insight, and lack of protective ability. She also stated that mother had told her she had been living with relatives until recently, and it would give her pause if she learned that she had told the Department she had been living in her own apartment the entire time.

The apartment property manager who spoke to the level five social services practitioner was called to testify on mother's behalf. She said mother and D.A. had not come into the office together to recertify the lease. She also explained that D.A. could not be taken off the lease because mother had declared she had no income, so the ability to recertify and retain the apartment depended on D.A.'s income.

The manager did not recall telling the practitioner that mother had not been staying at the apartment, that she was monitoring the premises by a phone application connected to the camera, or that the neighbors reported seeing her come to the apartment with D.A. in the evening and leave before morning. The manager testified she did remember telling the practitioner she was not allowed to give out any information.

The court denied mother's section 388 petitions. It adjudged L3 a dependent of the court, bypassed family reunification services as to him, and set a permanent plan selection hearing for all three children. Mother filed a notice of intent to file and filed a

10

writ petition challenging the juvenile court's decisions. We issued an order to the Department to show cause and it filed a responsive brief in which it argues the juvenile court's orders were properly made.

**DISCUSSION**

Mother argues the court erred when it denied her section 388 petitions, denied reunification services as to L2, and when it set the permanent plan selection hearing without limiting the issue to whether a guardianship should be established. We disagree.

*1. Denial of the Section 388 Petitions*

Mother claims the court should have granted the section 388 petitions because she had made a permanent substantial change and it would be in the best interests of L1 and L2 to be returned home or to provide her with additional family reunification services.

Any person with an interest in a dependent child may file a section 388 petition to change an earlier order of the court if the person can establish there is a substantial change of circumstances or new evidence, and that the proposed modification would be in the child's best interests. (§ 388; *In re Stephanie M.* (1994) 7 Cal. 4th 295, 317; *In re N.F.* (2021) 68 Cal.App.5th 112, 120-121 (*N.F.*).) The petition is addressed to the sound discretion of the juvenile court and its decision will not be disturbed on appeal in the absence of a clear abuse of discretion. (*N.F.*, at pp. 120-121.) In making its determination, the court may consider the entire factual and procedural history of the case. (*Id.* at p. 120.)

Here, we do not find the court abused its discretion when it denied mother's section 388 petitions because she did not establish either a substantial change of

11

circumstances or that her proposed change of order would be in the best interests of L1 or L2.

## 2. *Mother did not establish a change of circumstances*

The court reviewed the history of the dependency proceedings and found no indication mother had accepted responsibility for her actions that brought the children under the court's jurisdiction. It found that mother is not credible, that she lied about significant matters thereby adversely affecting her overall credibility, and she would say whatever she thinks is necessary to get the children returned. Her consistent pattern of lying left the court unable to assess the credibility of anything she had said over the life of the case. She could not be counted on to tell the truth about her relationship with DA., she hid her pregnancy with L3, failed to be forthcoming about his birth, and made efforts to hide him from the Department. She lied to the police about following the foster parent. And, she had claimed to be living with relatives in Corona while pretending to live alone in Hesperia in an apartment with a camera in the window and specifically lied about who was on the lease.

The court also found that although mother had positive reports from her service providers, there was no indication she had accepted responsibility for her actions bringing the children under the court's jurisdiction. Nor did the testimony of therapist Minnick provide evidence of any change in mother's circumstances. Minnick had not even read any of the Department's reports and had only three encounters with mother before she began making recommendations. Even when the therapist did have access to the case

records, she testified to reviewing only three or four reports out of the 15 that had been prepared by the Department before forming her opinion.

The court also found troubling that Minnick, who had worked with Children and Family Services for many years, would recommend the return of young children without having, at minimum, the full case history and without therapeutic focus on mother's acceptance of responsibility for her part in the actions leading to the children's dependency. Instead, Minnick's opinions were based on mother's self-reporting, that is, on reporting by a person the court found not to be credible and whose self-serving statements changed according to her audience.

Mother argues the record establishes she had made permanent substantial change. In support, she points to Minnick's opinion that she had gained insight into what brought the children before the court and would be protective of them, an opinion mother notes is supported by prior therapist Gonzalez. Mother's claim fails to take into account the court's reasonable rejection of Minnick's conclusions.

Mother also claims the facts that she divorced D.A. and applied for a restraining order support a finding of a change in her circumstances. The divorce was final a month before the court terminated family reunification services so that development is neither new evidence nor a change in circumstances for the purposes of the petitions. Mother's effort to obtain a restraining order against D.A. shortly before the petitions were heard and on the heels of the Department's June 2021 report recommending their denial does not represent a sufficiently substantial change in circumstances in the absence of credible

13

evidence that she had made genuine and reasonable efforts to address the issues causing the children to be declared dependents of the court.

Mother posits the testimony of the property manager put to rest concerns that mother and father had been continuing their relationship after family reunification services were terminated. Not so. Although the court acknowledged the possibility that the level 5 practitioner could have exaggerated the property manager's statements that the two had been seen together late at night and early in the morning, it noted the manager testified she was not supposed to give information to the practitioner and concluded the evidence tended to corroborate the veracity of what the practitioner said she had been told by the manager.

*3. Return of L1 and L2 to mother, or offering further reunification services is not in the children's best interests*

Even if mother had shown a substantial change in circumstances, she would not prevail on her petitions because she failed to establish that granting additional services or returning L1 and L2 to her custody would be in their best interests.

Where, as here, the court has terminated reunification services and the matter is in the permanent planning stage, the court's focus shifts from the parent's interests in the care, custody, and companionship of the child to the child's interest in permanency and stability. (*N.F.*, *supra*, 68 Cal.App.5th at p. 121.)

Here, the juvenile court found it was not in the best interests of L1 and L2 to grant mother's petitions. It pointed to (i) mother's lack of acceptance of the facts that D.A. sexually abused G.M. and that she had failed to protect her, (ii) her failure to demonstrate

14

she has clearly separated from D.A., and (iii) her failure to establish her readiness to cooperate with the Department and to be truthful with the court. For the reasons set forth *ante* with respect to the juvenile court's finding of no substantial change in mother's circumstances, we find no abuse of discretion in the court's finding that granting mother's petitions would not be in the best interests of L1 and L2.

Mother posits the juvenile court erred because "all evidence" shows it is in the children's best interests to have services reinstated or to be returned home. In support of that proposition, she claims there are no facts to support the conclusion that there continues to be a problem in her home because G.M. no longer lives there and because she is protective. Mother also claims she visited consistently with L1 and L2, she has a bond with them, and that both children feel safe in her care and want to return home. Her claims are not persuasive.

The fact that G.M. is no longer in the home is not relevant. G.M. was removed and placed with her father when the proceedings commenced, and none of the court's findings during the dependency proceedings with respect to the risks to L1 and L2 of being placed with mother involve the presence or absence of G.M. in the home.

Mother's assertion that she is "protective" is contrary to the court's reasonable findings that her circumstances had not substantially changed, she had not accepted the facts that G.M. had been sexually abused and she had failed to protect her, she had failed to demonstrate she has clearly separated from D.A., and she had failed to establish her readiness to cooperate with the Department and to be truthful with the court.

15

Mother cites no authority for the proposition that her regular attendance at supervised visits with her children and her good relationship with them is sufficient to support a finding that the interests of L1 and L2 are best served by returning them to her or by providing additional services. Mother's lack of credibility and failure to cooperate with the Department alone provide reasonable support for the court's conclusion that granting mother's petitions would not be in the children's best interests.

### 4. *The denial of reunification services as to L3*

Mother argues the juvenile court erred when it failed to provide reunification services for L3. We disagree.

Subdivision (b)(10) of section 361.5 authorizes the juvenile court to bypass provision of family reunification services if it finds by clear and convincing evidence that (i) the dependent minor's sibling had also been declared a dependent and removed from the parent's custody, (ii) reunification services as to the sibling had been ordered terminated because the parent failed to reunify with that child, and (iii) the parent had not subsequently made a reasonable effort to treat the problems that led to the sibling's removal from the parent. We review a denial of services for substantial evidence, being mindful of the higher standard of proof required in the juvenile court when bypass of reunification efforts is ordered. (*Jennifer S. v. Superior Court* (2017) 15 Cal.App.5th 1113, 1121-1122.)

Here, the court had removed L3's siblings because of D.A.'s sexual abuse of their half sister, G.M., and mother's failure to protect her from that abuse. Mother, who was aware D.A. had previously sexually abused a family member over a period of eight years,

16

refused to believe G.M. when she told mother that D.A. abused her. Mother told G.M. to forget it happened and to forgive D.A. She described G.M. as a compulsive liar and made affirmative efforts to prevent the child from telling others what had happened to her.

When ordering reunification services for L1 and L2 during the reunification period, and when terminating services in November 2020, the court made clear the need for mother to address in therapy the reasons for the court's removal of the children, but mother continued to deny and minimize those issues. After services were terminated, mother began therapy with Minnick but, as discussed *ante*, the record supports the juvenile court's conclusion mother did not take that opportunity to address the issues that caused the court to remove L3's siblings from her. Accordingly, the court properly denied services to mother with respect to L3.

5. *The court's decision not to limit the permanent plan selection hearing to guardianship*

Mother argues the juvenile court erred when it set the cases of all three children for a hearing pursuant to section 366.26 without limiting the plan selection to guardianship. She cites no authority for her assertion but simply declares without citation to the record that she had "an awesome relationship" with her children and that it is a "major leap" to go from a recommendation of guardianship to a plan of adoption. In view of mother's failure to state a reasoned argument with citation to legal authority and proper citations to the record, we deem her claim forfeited. (Cal. Rules of Court, rule 8.204(a)(1)(B), (a)(1)(C); *In re S.C.* (2006) 138 Cal.App.4th 396, 406-408.)

17

## DISPOSITION

The petition for extraordinary writ and the request for stay are denied.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

RAMIREZ
P. J.

We concur:

MILLER
J.

SLOUGH
J.

18